## IN THE CHANCERY COURT OF LOWNDES COUNTY, MISSISSIPPI

**THE STATE OF MISSISSIPPI,** *ex rel.***, JIM
HOOD, ATTORNEY GENERAL,**                                        **PLAINTIFF**

**VS.**                                        **CIVIL ACTION NO.  17-22-B**

**GOOGLE LLC f/d/b/a GOOGLE, INC.,**                                        **DEFENDANT**

### <u>FIRST AMENDED COMPLAINT</u>

Plaintiff, the State of Mississippi, by Jim Hood, Attorney General ("the State") files this

First Amended Complaint against Defendant, Google LLC, formerly doing business as Google,

Inc. (hereinafter "Google"), and alleges as follows:

## I.    <u>INTRODUCTION</u>

1.      The State of Mississippi, by and through Attorney General Jim Hood, brings this

action under authority of the Mississippi Consumer Protection Act, MISS. CODE ANN. §§ 75-24-

1, *et seq.*

2.      This action arises from Google's (a) unfair methods of competition and (b) unfair

and deceptive trade practices regarding Google's statements, contractual promises,

commitments, and material omissions beginning from 2007 to the present and concerning its

collection, usage, processing, and retention of the personal information and data of Mississippi

K-12 students who use Google's G Suite for Education ("G SUITE")[1] and Chrome Sync.

3.      From 2007 to the present, Google is guilty of an overarching scheme of deception

aimed at Mississippi's schools, youth, and parents to collect, store, and use student personal

information and data (some accessed by merely opening a G SUITE account) in violation of its

contractual promises, its own policies, and the expressed limitations to which it agreed through

multiple written assurances, including but not limited to the G SUITE for Education Agreements

---

[1] G SUITE was formerly known as "Google Apps for Education" ("GAFE"). All references to G SUITE include the operative period of 2007 to the present and applicable Google product, whether GAFE or its successor.

1

with Mississippi Schools, Data Processing Agreements, G SUITE Privacy Notices, and the K-12 School Service Provider Pledge to Safeguard Student Privacy ("the Pledge"). Further, Google has intentionally omitted from its statements material information about its conduct, all to further advance its scheme of unfair competition and deception.

4.    To Mississippi K-12 schools that use its services, Google promises that it safeguards and uses student personal information it collects only to provide the G SUITE services, that it does not use or process student data for advertising purposes, and that it will not share student data with third-parties who are not contractually allowed to obtain it. These statements are false and coincide with material omissions of Google's actual conduct.

5.    Google has also represented that it did not use Mississippi children's email content for advertising purposes, that it did not submit their email content through advertising processes, and that it only uses email content to provide the service of Gmail to the students. These statements are also false.

6.    Finally, Google warrants that all its conduct is compliant with the Children's Online Privacy Protection Act of 1998 ("COPPA"), which would include the corresponding regulations implementing COPPA. These guarantees are explicitly false and are designed solely to further Google's scheme of unfair competition and deception in Mississippi.

7.    Through its deceptive promises, omissions, and commitments, Google claims that it offers G SUITE for "free."  In reality, Google gains unfettered access to vast amounts of valuable student personal information and data solely as a result of the students' G SUITE accounts. Once a student signs up for a G SUITE account, Google uses and processes students' personal information and data to track, record, and save the online activity of Mississippi's children. With their personal information and activity logs, Google builds individual profiles of

2

each student unrelated to educational activities and services, all of which Google uses for its own commercial and advertising purposes. The scheme is very simple: G SUITE is the gateway to a treasure trove of personal information on Mississippi's youth to which Google would not otherwise have access.

8.     Google's scheme both secures it an unfair advantage over its competitors by offering purported "free" educational services and deceives the Mississippi public regarding its data and privacy practices. Thus, Google's deceptive scheme amounts to (a) unfair methods of competition affecting commerce, and (b) unfair and deceptive trade practices, both in violation of Mississippi's Consumer Protection Act, MISS. CODE ANN. §§ 75-24-1, *et seq.*

9.     The operative time period for this action is 2007 to the present and continuing. While Google's statements and material omissions form the basis, in part, of its unfair competition and deceptive conduct, the examination of its underlying conduct is necessary to demonstrate the unfair and false nature of its statements. Throughout the operative time period, Google has occasionally modified both its underlying data processes and its representations applicable to G SUITE and Mississippi K-12 students.[2] When the State alleges that Google did or did not perform an act through the provision of its services, the allegation includes all subsequent versions, operations, and iterations of Google's processes as applicable to all corresponding versions and iterations of Google's representations, promises, and commitments.

---

[2] For instance, until at least the spring of 2014, Google submitted Mississippi K-12 students' email content through a server Google called "Content Onebox" ("COB"). Despite Google's representations to Mississippi schools and K-12 students that it would not submit student email content through its advertising processes, Google knowingly and deliberately used COB for advertising purposes.

## II.  PARTIES

10.     The State of Mississippi, by and through Attorney General Jim Hood, as chief
legal officer for the State of Mississippi, brings this action in its sovereign capacity. The State of
Mississippi is a sovereign created by the Constitution and laws of the State of Mississippi. As
such, Mississippi is not a citizen of any state. Jim Hood is the State's duly-elected Attorney
General. The Attorney General brings this action on the State's sole behalf pursuant to his
authority granted by Miss. Const. art. 6, § 173; Miss. Code Ann. § 7-5-1; and, specifically
Miss. Code Ann. §§ 75-24-1, *et seq*.

11.     Google LLC, formerly doing business a Google, Inc., is a limited liability
company with its principal place of business in Mountain View, Santa Clara County, California.
The State previously filed suit against Google, Inc.; which answered and admitted Plaintiff's
allegations about its identity. During the pendency of this suit, Google, Inc., converted to
Google, LLC. All references to "Google" will include its acts as both Google, Inc., and Google,
LLC. At all times material herein (years 2007 to the present), Google has been doing business,
and continues to do business, in the State of Mississippi. Google has appeared in this matter.

## III.  JURISDICTION

12.     Subject matter jurisdiction for the instant controversy is conferred upon the
Chancery Court of Lowndes County pursuant to Miss. Const. art. 6, § 159, and Miss. Code
Ann. §§ 9-5-81 and 75-24-9. Google is subject to personal jurisdiction in Lowndes County
pursuant to Miss. Code Ann. § 13-3-57, as it does business and performs services in this State
and in Lowndes County.

13.     The instant Complaint does not confer diversity jurisdiction upon the federal
courts pursuant to 28 U.S.C. § 1332 because Mississippi is not a citizen for purposes of diversity

jurisdiction. Likewise, the State does not invoke federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the State alleges exclusively state law claims against Google pursuant only to MISS. CODE ANN. §§ 75-24-1, *et seq*. Nowhere does the State plead, expressly or implicitly, any cause of action or request any remedy that arises under or is founded upon federal law; nor does it bring this action or seek any relief on behalf of any person, a class, or any group of persons that can be construed as a class. The relief sought by the State pursuant to MISS. CODE ANN. §§ 75-24-9 and 75-24-19 is only afforded to the Attorney General and not individual persons, and the State pursues such relief in its singular sovereign capacity. The State seeks no relief pursuant to MISS. CODE ANN. § 75-24-15, and it seeks no relief on behalf of any person(s) pursuant to §§ 75-24-11 and 75-24-13. The State specifically disclaims any such claims that would support removal of this action to a United States District Court on the basis of diversity or jurisdictional mandates under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453, 1711-1715. The issues presented in the allegations of the instant, well-pleaded Complaint do not implicate significant or substantial federal issues and do not turn on the necessary interpretation of any federal law. The State expressly avers that the only causes of action claimed, and the only remedies sought herein, are founded upon the statutory, common, and decisional laws of the State of Mississippi related to MISS. CODE ANN. §§ 75-24-1, et seq., and with the expressed exclusion of MISS. CODE ANN. §§ 75-24-15 and for any person(s) pursuant to §§ 75-24-11 and 75-24-13. The assertion of federal diversity jurisdiction over these claims would improperly disturb the constitutionally mandated and congressionally approved balance of federal and state responsibilities because federal jurisdiction does not exist over this case under the Class Action Fairness Act. *See Mississippi ex rel. Hood v. AU Optronics Corp*., 559 Fed. Appx. 375, 376-377 (5th Cir. Miss. 2014) (citing *Mississippi ex rel. Hood v. AU*

*Optronics Corp.*, 134 S. Ct. 736, 187 L. Ed. 2d 654 (2014)). Accordingly, any attempt by Google to remove this case to federal court would be without a reasonable legal basis in fact or law.

## IV.  VENUE

14.    Venue is proper in the Chancery Court of Lowndes County pursuant to MISS. CODE ANN. § 75-24-9 and MISS. R. CIV. P. 82(b), as Google did market, promote, advertise, implement, administer, and maintain contracts for G SUITE and Chrome/Chrome Sync in Mississippi and in Lowndes County specifically.

## V.  FACTUAL BACKGROUND

15.    All allegations herein arise from facts currently known, information, and belief.

**A.    Google's G Suite for Education Services, Data Collection, and Data Use**

16.    G SUITE is a web-based service that Google markets as "free" to educational institutions, including K-12 schools in Mississippi.

17.    To deliver G SUITE to schools, Google contracts with an educational institution (referenced in relevant Google contracts and policies as "Customer school" or "Customer"). Because Google markets G SUITE as purely educational, schools may enter into such contracts directly with Google, apart from parents and students. The name of the products, Google Apps *For Education* and G Suite *For Education* expressly denote this purpose. Notably, Google does not contract with students or their parents for the provision of G SUITE or any other Google services accompanying it.

18.    When a Customer School contracts with Google to use G SUITE, Google requires that the Customer School create individual Google accounts ("G SUITE accounts") for students. Upon enrollment, each student receives a username and password identifying that G SUITE student user with a particular G SUITE account in the Customer School's domain. The student's

G SUITE account is a Google Account created and managed by a school for the use of students and educators. In fact, Google assures each Mississippi school that they are the administrators of the accounts and that Google is merely a "data-processor." Notably, while the minimum age for opening a standard Google account is thirteen (13), G SUITE accounts are offered for Mississippi students in grades K-12.

    **1.**      **Upon creation of G SUITE accounts and within all Google services by virtue of the G SUITE account, Google collects and maintains student personal information and creates individual profiles of Mississippi students for non-educational, commercial purposes.**

    19.     In G SUITE, Google collects various personal information from the schools and students, including their names, email addresses, telephone numbers, age,[3] and gender. Google further collects a wide range of student personal information *each time* a student logs in to his or her G SUITE account. This includes device information, such as the hardware model, operating system, unique device identifiers, and mobile network information; the student's internet protocol (IP) address, GPS, and other location sensors; unique application numbers; and cookies or similar technologies. This data allows Google to know the specific devices an individual student uses, know the location of each student when logged in his or her G SUITE account, and track each student's online activity. Google collects all of this information solely via schools' and students' use of G SUITE.

    20.     Google associates all this information with each student's individual G SUITE account by way of a technology Google calls the "Google Accounts and ID Administration," or "GAIA ID."  Like a member ID, the GAIA ID is Google's identification management system and is essentially a set of numbers specific to an account that attaches to each piece of collected data from a G SUITE child user's online activity.

---

[3] Or, by virtue of the account, Google knows the student is a minor.

21.     Indeed, the GAIA ID is each student's individual identity across every Google service the student accesses and across every device a student uses to access Google services. Thus, no matter what device a student uses to log in—whether at school, home, or a friend's house; and whether on PC, tablet, or smart phone—, Google knows the identity of individual students by virtue of their GAIA IDs and/or devices, and Google tracks their online activity.

22.     Google does not only *track* individual students' online activity, but also records and stores it—what students click on, the websites they visit, the search terms they use, the videos they watch, the comments they've posted or "liked," and the content of the emails they send and receive, *among other things*. Google thus "logs" all students' online activity while they are signed in, stores the logs within Google servers, and associates students' logs with their individual GAIA IDs.

23.     G SUITE accounts offer students access to a "suite" of Google internet services and include twelve (12) applications for the G SUITE account: Gmail, Calendar, Contacts, Drive, Docs, Forms, Groups, Sheets, Slides, Talk/Hangouts, Vault, and Classroom. Google refers to these twelve (12) applications as the G SUITE "Core Services."  The Core Services are not publicly available; it is only through the creation and use of a G SUITE account that students can access them. Through students' use of G SUITE accounts, Google collects data and uses GAIA ID to identify the student's online activities in the Core Services. Google does not inform schools, parent, or students that it perpetually associates collected data to students' accounts.

24.     In addition to the Core Services, Google promotes what it calls "Additional Services." These include applications such as Search, YouTube, Maps, Photos, Books, News, Play, and Voice. Unlike the Core Services, a G SUITE account *is not required* to access to the Additional Services. However, when a student signs in to his G SUITE account and accesses an

Additional Service while signed in, Google collects, processes, and uses his GAIA ID to associate that child's data to his personal G SUITE account. Whereas Google cannot associate collected data with a child who simply accesses the "Additional Service" merely as an unidentified public user, through the G SUITE account Google can use GAIA to identify the student, associate data personally to him, and store his personally identifiable data. Google does not inform schools, parents, or students that it perpetually associates collected data with students' accounts.

25.    In this way, Additional Services are not "additional" to G SUITE at all. Like Google or non-Google websites, these services are freely accessible to any person with access to the internet, whether he or she has a Google account or not. But unlike anonymous internet users, when G SUITE users are logged in to their G SUITE accounts, Google can identify the child user, collect and retain data, associate that data to the child, and track that child's activity across the Additional Services. Thus, these services "add" nothing to G SUITE other than Google's ability to *additionally* track, monitor, and profile Mississippi students' online activities for its own commercial purposes.

**2.    Google also uses G SUITE to collect and maintain student data from across the internet for its own commercial purposes.**

26.    Google's tracking is not limited to the use of Google services. On information and belief, when Mississippi K-12 students access non-Google websites while signed in to their G SUITE accounts, Google still records their internet activity, associates it with each students' personal G SUITE account, and retains that information in direct association with each individual student. Google would not be able to associate any of this data to an individual student but for schools' and students' use of G SUITE. Google never informs schools, parents, or children of this activity.

27.    More nefarious, even when a Mississippi student accesses a Google service—

"Additional" or otherwise—and is *not* signed in to their G SUITE account, Google *still* collects,

retains, and stores that student's information and associates it with the student's device. For

public or anonymous users of Google sites, Google collects and retains data from those users and

associates it with the particular *device* they use, rather than a particular person. Thus, when a

Mississippi student uses a particular device to access a Google website, Google collects and

stores information about the device, but not the identity of the child. However, when the same

student signs in to his G SUITE account using that *same* device he used when not signed in,

Google matches the device (and all activity associated with it from prior sessions) to the

individual student. Google then associates the student's prior activities while *not* signed in with

the student's G SUITE account. Thus, although a G SUITE account is not required to access the

Additional Services, *it is only through the G SUITE school account that Google can collect,*

*track, and maintain information on a Mississippi student who uses an Additional or other*

*Google or non-Google service—whether they are signed in to the G SUITE school account or*

*not.* Google never informs schools, parents, or children of this activity.

28.    Thus, while Google tells school administrators that they can enable or disable

students' use of Additional Services through the G SUITE account, Google *still* collects, tracks,

and stores—be it through the G SUITE account, device id, or other yet undiscovered means—

Mississippi student information, associates the data with the individual student, and stores in

relation to the individual student.

29.    Simply put, if the Mississippi student did not have a G SUITE account required

for use with the Core Services, the student would be anonymous like other consumers who have

no Google account. But through the G SUITE school account—and only by virtue of it—Google knows and associates all the Mississippi student's online activities.

30.     Using the technologies and processes discussed above, Google uses students' personal information that it obtained through their use of G SUITE, the logs of students' online activity across the internet, and other data to create individualized profiles on each student. Google associates these individualized profiles with each individual student by way of his or her GAIA ID. Like their personal information and activity logs, students' individual profiles follow them from Google account to account by way of their GAIA ID.

31.     Contrary to its contractual promises and commitments, and concealed by material omissions, Google utilizes student personal information, activity logs, the individual profiles they comprise, email content, and additional but yet undiscovered data to support its commercial and advertising purposes, including but not limited to the service of advertising to students and others, improving its advertising technologies, creating new Google services, sharing data and analytics with third parties, and using Mississippi K-12 student data for purposes far beyond educational uses or even to provide the Google service the student is using.

32.     All allegations herein apply regardless of whether students are signed in to their G SUITE accounts through a Google website or have Chrome Sync enabled in Google's Chrome browser.

**3.      Within the Gmail Core Service, Google has scanned students' email content for non-educational, advertising, and commercial purposes.**

33.     Gmail is Google's web-based email service and is one of the G SUITE Core Services. Much like its logging of student online activity, Google also scans the content of each G SUITE student's email message.

11

34.     Prior to April of 2014, and within each Mississippi student's G SUITE Gmail account, Google used a technology called Content Onebox ("COB") and multiple servers associated with COB to extract information from the text within the student's email and process it. The COB process allowed Google to acquire student email content and to understand the concepts and meaning of the email content through its advertising processes. Similarly, with the use of users' GAIA IDs, Google can inspect overall attributes of users' inboxes and review their entire email history. The data extracted then goes to Google's advertising team for advertising purposes and to generally improve advertising in Gmail.

35.     On March 13, 2014, Google publicly confirmed that the emails of all G SUITE for education end users were in fact scanned, processed, and data-mined for potential advertising via Google's automated processes that could not be disabled—even for G SUITE educational customers who elected not to receive ads. On April 30, 2014, Google announced that it would permanently remove all ad scanning in Gmail for G SUITE. Google further explained that it would no longer collect or use student data in G SUITE for education services for advertising purposes. The State seeks to confirm Google's statement and alternatively alleges that Google continues to data-mine the email content of Mississippi's students and use it for purposes beyond providing the Gmail service.

**B.     Google misrepresents and materially omits its data collection practices in violation of multiple contractual promises, commitments, and written assurances.**

36.     Google began rolling out its G SUITE platform to Mississippi K-12 schools in 2007, and Mississippi K-12 schools have continued to use G SUITE from 2007 to the present.

37.     As part of providing G SUITE services, Google required that Mississippi K-12 schools enter into various agreements that Google has revised many times since the schools began using G SUITE. These Agreements include the G Suite for Education (Online)

Agreement[4] (the "G SUITE Agreement") and the Data Processing Amendment to the G SUITE

Agreement[5] (the "Data Processing Amendment" or "DPA").

38.    The G SUITE Agreement and DPA reference and incorporate terms from the

Google Apps Privacy Notice ("G SUITE Privacy Notice"), which like the G SUITE Agreement

and DPA, have themselves seen numerous versions since 2007.

39.    Within these agreements, Google makes multiple commitments and statements

concerning the scope of its student data collection and usage practices.

**1.    Google misrepresented and materially omitted its student data collection, use, and processing in its Agreements and additional commitments effective between 2008 and 2014.**

40.    Between October of 2008 and May of 2014, the G SUITE Agreement's

provisions controlling Google's collection and use of student data were essentially the same.

First, Google promised that it would not disclose students' "Confidential Information" or use it

for any purpose other than to "exercise rights and fulfill obligations under" the Agreement.

Those obligations are to allow for the creation of an account to access the Core Services.

41.    Google's definition of "Confidential Information" expressly incorporates another

of its contractual terms, "Customer Data," which itself includes "data, including email, provided,

generated, transmitted or displayed" by Mississippi K-12 students via the G SUITE Core

Services. Because Google requires that a G SUITE account be opened to access and use the Core

Services, the G SUITE account itself and associated data is necessarily "Customer Data."[6] Thus,

Google promised to only use data that students or schools provide, generate, transmit, or display

---

[4] Previously, Google also referenced this Agreement as the "Google Apps for Education Agreement."
[5] Since 2012, Google has referenced various versions of this document as the "Data Processing Amendment to Google Apps Enterprise Agreement," the "Data Processing Amendment to G Suite Agreement," and "Data Processing Amendment to G Suite and/or Complementary Product Agreement."
[6] The Agreements specifically state they govern "Customer's ***access to*** and use of the Services;" "[U]se of Services to (a) provide End User *Accounts* to its End Users . . . .";

through G SUITE account and Core Services for one purpose: only to exercise rights and fulfill obligations under the G SUITE Agreement. Confidential Information also includes data that would be "considered confidential under the circumstances," such as a Mississippi child's private on-line activities. Google thus promised not to use students' private online activities for purposes other than to exercise rights and fulfill obligations under the G SUITE Agreement.

42.     Also in the G SUITE Agreement, Google promised that it would *comply* with the G SUITE Privacy Notice. The G SUITE Privacy Notice in effect between 2008 and 2014 set out both what personal information Google would collect from students and how Google would use it. First, Google would collect personal information upon account creation, such as contact information. Google also would collect a wider range of personal information each time a student used G SUITE,

> such as account activity (including storage usage, number of log-ins), data displayed or clicked on (including UI elements, ads, links); and other log information (including browser type, IP-address, date and time of access, cookie ID, and referrer URL).

As to *how* Google would use this information, Google gave three purposes, each consistent with exercising its rights and fulfilling its obligations under the G SUITE Agreement: (1) to provide the G SUITE services; (2) to improve G SUITE services; and (3) to send to the student.

43.     Neither the G SUITE Agreement nor the G SUITE Privacy Notice disclosed that Google would use the student personal information it collected as described above, or that it collected such data to create student profiles for Google's own commercial and advertising purposes. Despite Google's promises and commitments within the G SUITE Agreement and G SUITE Privacy Notice, Google collected student personal information to do just that.

44.     The G SUITE Agreements effective during this time stated that Google would not show advertising to G SUITE account holders by default, but Google provided school

administrators the option to enable advertisements. In any event, Google (1) never disclosed that

such advertising, if enabled, would entail *targeted* advertising based on Google's collection of

student personal information and associated logs of their online activity; and (2) never disclosed

that, whether advertising was enabled or disabled, Google would use student personal

information and associated activity logs to create and build student profiles for commercial and

advertising purposes.

45.    Google began using its Data Processing Amendment in November of 2012, and

thereafter, the G SUITE Agreement incorporated the DPA by reference. The DPA supplements

the G SUITE Agreement regarding Google's *processing* of students' "Customer Data," which

the DPA originally defined as "email and other data (including personal data) provided,

generated, transmitted, or displayed" via G SUITE Core Services by end users, including

students.

46.    As in the G SUITE Agreement and G SUITE Privacy Notice, Google promises in

the DPA to only process student "Customer Data" to (1) provide the G SUITE Services; (2)

operate, maintain, enhance and support the infrastructure used to provide the G SUITE Services;

(3) comply with users' processing instructions in their use of G SUITE; and (4) respond to

customer service requests.

47.    To the extent Mississippi K-12 students use Additional Services or non-Google

services, the DPA provided that Google would allow these sites access to students' personal

information only "as required for the interoperation" of G SUITE Core Services and the

applicable Additional Service or non-Google service.

48.    The interoperation of G SUITE Core Services with other Google or non-Google

services requires neither wholesale data collection and association, nor the creation of student

profiles with every piece of personal information and activity logs Google collects, nor the processing of such data for commercial and advertising purposes.

49.     Like the G SUITE Agreement and G SUITE Privacy Notice, the DPA assures that Google processes student personal information for limited purposes—none of which includes its processing to create profiles of students for Google to use for its own commercial and advertising purposes. Despite Google's promises and commitments within the DPA, Google collected and processed student personal information to create profiles of students that Google used for its own commercial and advertising purposes.

50.     Absent from any statements during this time is Google's practice of collecting data from student G SUITE accounts and from Core Services to use in Google's Additional Services. Also absent is Google's practice of collecting student data in the Additional Services, tagging it with students' GAIA IDs, storing it in association with individual students, profiling individual students, and using their data throughout Google's services.

51.     On information and belief, Google also collected Mississippi student data from their non-Google website activity and associated it with their individual G SUITE accounts.

52.     There is simply no indication in Google's operative documents that it was wholesale collecting Mississippi K-12 student data, associating it with each student's particular account, and using it for essentially whatever purpose Google chose, so long as it did not show advertisements within the Core Services. These omissions were material and deceptive, as Google never informed Mississippi schools, their parents, or the students of the true nature of Google's access to identifiable student information or its activities.

53.     Also contrary to its commitments, Google has and continues to unlawfully disclose and share with third parties confidential data of Mississippi students that Google collected through G SUITE.

**2.      Google misrepresented its student data collection, use, and processing in agreements and additional commitments effective from 2014 to the present.**

**a.      The G SUITE Agreement and DPA**

54.     In 2014, Google updated the G SUITE Agreement and DPA. The updated G SUITE Agreement maintained Google's promises detailed above, and Google added a new promise that "Google does not serve Ads in the Services *or use Customer Data for Ads purposes*."

55.     "Advertising purposes" is not limited to the action of displaying advertising to a student. For example,

- When Googles uses a Mississippi K-12 child's device information from the G SUITE log-in process to determine that child's location and display an ad in an Additional Service that is geographically targeted to the student, Google violates the Agreement;

- when Google uses the gender of a Mississippi K-12 child to recommend the child purchase a book more geared to the demographic of the child's sex, Google violates Agreement;

- when Google observes the child's online activity to expand its knowledge of how people of that child's age, gender, and location (all student data) interact with particular content or ads or obtains "impressions" related to the child, that is an advertising purpose prohibited by the Agreement; and

- when Google takes Mississippi K-12 student data, removes the GAIA ID to purportedly "anonymize" that data, and adds it to a corpus of other data to use towards advertising, that is an advertising purpose prohibited by the agreements.

- Likewise, Google's use of analytics derived from online activities in conjunction with the student's data of age, gender, and location are prohibited Google activities in violation of the Agreement.

These examples, which have occurred and continue to occur, and other yet undiscovered conduct, all constitute violations of the G SUITE Agreement.

56.     Likewise, the amended DPA maintained its prior promise to only process "Customer Data"[7] in accordance with schools' or end-users' instructions, to provide G SUITE, or to provide customer support. The amended DPA further promised, "Google will only process Customer Data in accordance with this Agreement and *will not process Customer Data for any other purpose*." It continued, "For clarity, and notwithstanding any other term in the Agreement, Google will not serve Advertising in the [G SUITE] Services *or use Customer Data for Advertising purposes*."

57.     As with the prior version of the DPA, Google again promised that, when students' accessed Google or non-Google services outside of G SUITE Core Services, it would only allow those other services access to students' "Customer Data" as required for the interoperation of those other services and G SUITE.

58.     Despite its promises, Google collected, used, and processed student personal information and associated activity logs to create individual profiles for purposes beyond the limitations it set out in the G SUITE Agreement and DPA—namely, for its own commercial and advertising purposes.

   **b.     The G SUITE Privacy Notice**

59.     Google made multiple changes to its G SUITE Privacy Notice beginning in February of 2016. The notices first describe the "personal information" Google collects from students upon account creation. The August 2016 version states, e.g.,

---

[7] The amended DPA defined, and still defines, "Customer Data" as "data (which may include personal data and the categories of data referred to in Appendix 1) submitted, stored, sent or received via the [G SUITE] Services by Customer, its Affiliates, or End Users." Appendix 1 adds that such data "may include user IDs, email, documents, presentations, images, calendar entries, tasks and other electronic data."

A [G SUITE] account is a Google Account created and managed by a school for use by students and educators. When creating this account, the school may provide Google with certain personal information about its students and educators, including, for example, a user's name, email address, and password. Google may also collect personal information directly from users of [G SUITE] accounts, such as telephone number or a profile photo added to the [G SUITE] account.

Google also collects information based on the use of our services. This includes:

- device information, such as the hardware model, operating system version, unique device identifiers, and mobile network information including phone number of the user;

- log information, including details of how a user used our service, device event information, and the user's Internet protocol (IP) address;

- location information, as determined by various technologies including IP address, GPS, and other sensors;

- unique application numbers, such as application version number; and

- cookies or similar technologies which are used to collect and store information about a browser or a device, such as preferred language and other settings.

60.    The Privacy Notice then addresses *how* Google will and *will not* use this information, affirmatively addressing "limitations on advertising" when students signed in to their G SUITE accounts venture outside of G SUITE Core Services:

Outside of the [G SUITE] Core Services, Google products and services may show ads, as described in the Google Privacy Policy. For [G SUITE] users in Primary/Secondary (K-12) schools, *Google does not use any personal information (or any information associated with a Google account) to target ads.*

(emphasis added). Updated several months later, another version adds, "Google does not serve ads in the Core Services *or use personal information collected in the Core Services for advertising purposes.*" Google continues,

For [G SUITE] users in primary and secondary (K-12) schools, *Google does not use any user personal information (or any information associated with a [G SUITE] Account to target ads, whether in Core Services or other Google services while using a[ G SUITE] account.*

19

(emphasis added). These terms remain operative in the Privacy Notice's current version.[8]

61.    Since the G SUITE Privacy Notice's 2016 update, the G SUITE Agreement affirmatively states, "The [G SUITE] Privacy Notice governs how Google collects and uses information from Customer or End Users."

62.    Despite Google's express assurances in the G SUITE Agreement, the DPA, and G SUITE Privacy Notice, from 2014 to present, Google collects student personal information from (1) the G SUITE account created by the School, student log-in, and their accessing the Core Services; (2) the students' use of the Additional Services; and (3) the student's other on-line activities; and Google uses this data for purposes beyond providing the G SUITE Services— namely, for non-educational purposes, for profiling of students, for commercial purposes, and for advertising purposes.

>    c.    **The K-12 School Service Provider Pledge to Safeguard Student Privacy**

63.    On or about October 7, 2014, the Future of Privacy Forum and the Software & Information Industry Association introduced the K-12 School Service Provider Pledge to Safeguard Student Privacy (the "Student Privacy Pledge" or "Pledge") to protect student privacy regarding the collection, maintenance, and use of students' personal information. The Pledge intends that K-12 school service providers safeguard student privacy and applies to all student personal information and to all student G SUITE user accounts.

64.    Google is a school service provider as defined by the Pledge.

---

[8] *See G Suite for Education Privacy Notice,* Google for Education, *available at* https://gsuite.google.com/terms/education_privacy.html?_ga=2.20839288.1714708909.1571669074-99954245.1571669074 (last visited Oct. 22, 2019).

65.    Google signed the Pledge in January of 2015. By doing so, Google affirmed and adopted the Pledge's various commitments and affirmatively represents that it abides by the Pledge's terms. The Pledge's assurances, therefore, are Google's own.

66.    As it relates to G SUITE accounts, Google expressly commits, in pertinent part, to:

- Not collect, maintain, use or share student personal information beyond that needed for authorized educational/school purposes, or as authorized by the parent/student;

- not use or disclose student information collected through an educational/school service (whether personal information or otherwise) for behavioral targeting of advertisements to students;

- not build a personal profile of a student other than for supporting authorized educational/school purposes or as authorized by the parent/student;

- not knowingly retain student personal information beyond the time period required to support the authorized educational/school purposes, or as authorized by the parent/student;

- collect, use, share, and retain student personal information only for purposes for which we were authorized by the educational institution/agency, teacher, or the parent/student; and

- disclose clearly in contracts or privacy policies, including in a manner easy for parents to understand, what types of student personal information we collect, if any, and the purposes for which the information we maintain is used or shared with third parties.

67.    Despite its express commitments, Google knowingly collects, maintains, uses, and shares student personal information for purposes beyond education and without consent from schools, parents, or students—namely, for its own commercial and advertising purposes.

68.    Further, Google does not clearly disclose in the G SUITE Agreement, DPA, G SUITE Privacy Notice, or other incorporated documents and URLs, in a manner easy or even possible for school administrators or parents to understand, what types of student data it collects and the scope of Google's usage. To the contrary, Google's various contracts, policies,

documents, and URLs constitute a labyrinth of cross-references, conflicting terms, and contradictory statements.

69.     It would take a truly dedicated school administrator, parent, or K-12 student to even make the futile effort to untangle Google's web. In fact, this would include no less than reviewing the G SUITE Agreement, DPA, and G SUITE Privacy Notice; Google's adoption of the Pledge; Google Terms of Service[9]; the Google Privacy Policy; multiple hyperlinks embedded in each; any help or information pages; and even more hyperlinks in the help or information pages.

70.     After trudging through these documents, the school administrator, parent, or K-12 student would have another insurmountable layman's task in reconciling which contract, document, term, or policy takes priority over any others. For example: (1) the G SUITE Agreement states it is governed by any applicable "Order Form," but that the Agreement takes precedence over any term located at any URL; (2) the Google Terms of Service states that, if there is a conflict between its terms and "additional terms," the additional terms will control for that conflict; and (3) the G SUITE Privacy Notice states that "the G Suite for Education Agreement (as amended) takes precedence, followed by this Privacy Policy and then the Google Privacy Policy." So the dedicated school administrator, parent, or student must also:

- obtain any applicable "Order Form" because Google does not make it readily available;

- unravel the meaning of "any URL" within in the G SUITE Agreement because Google's use of the term "any URL" does not comport with the definition of "URL Terms" in the G SUITE Agreement, which Google defines with *even more* cross-referencing, as merely the Acceptable Use Policy, the Google Compute

---

[9] While Google claims to incorporate the Google Terms of Service and Google Privacy Policy, nowhere does Google obtain any acceptance of these terms by parents or schools beyond the schools to consent for educational purposes. Further, while Google claims to incorporate the Google Terms of Service and Google Privacy Policy, its own testimony indicates that these are not part of the applicable agreements for G SUITE.

Engine Service Level Agreement ("SLA"), and the Google Technical Support Services ("TSS") Guidelines limits;

- determine whether the Pledge, G SUITE Agreement, DPA, or G SUITE Privacy Notice amount to an "additional term" as stated in the Terms of Service—thus taking priority over the Terms of Service—because these documents are not labeled or identified as additional terms to the Google Terms of Service; and

- determine when certain agreements, documents, policies, or terms apply or cease to apply.

71.    Nonetheless, the G SUITE Agreement and DPA constitute Google's agreement with Mississippi schools and state that the Agreement takes precedence over other terms. Likewise, the G SUITE Agreement states that it will comply with the G SUITE Privacy Notice, which in turn echoes that the G SUITE Agreement and DPA, then the Privacy Notice take precedence over other terms. In each, Google affirmatively (and deceptively) states that Google does *not* use students' personal information and activity logs that are associated with their G SUITE accounts for its own commercial and advertising purposes.

    **d.    Google omitted and still omits material information regarding its collection, use, retention, and association of Mississippi student data.**

72.    Still absent from Google's statements are material disclosures of how it collects, retains, tracks, and associates student data with GAIA and the multitude of improper uses of the data, including its sharing with third parties. Likewise, Google still fails to disclose that it collects, retains, tracks, and associates Mississippi student online activities from non-Google websites.

    **3.    Google mispresents the extent of Mississippi Schools' and Parents' access to student account information.**

73.    In numerous statements, Google assures Mississippi schools and parents that they have access to the information Google collects on Mississippi K-12 Students. In the G SUITE Agreements with Mississippi schools, Google has consistently contracted that the schools and

the school G SUITE administrators will have access to the data in student accounts and that Google is merely a "data-processor." Further, Google expressly states, "The parents of G Suite for Education users in Primary/Secondary (K-12) schools can access *their child's personal information* or request that it be deleted through the school administrator." These statements are false and deceptive.

74.     As alleged herein, Google associates information it collects from students' on-line activities (G SUITE, other Google services, non-Google services) with those users' individual G SUITE accounts through their GAIA IDs. When Google associates the information tagged with students' GAIA IDs to their accounts, Google treats the information as "personal information" of the student's G SUITE account. However, Mississippi schools and parents are not given full access to the various "personal information" gathered, used, and profiled by Google about Mississippi children.

**4.     Google also misrepresented(s) its scanning and use of student email data.**

75.     Prior to April of 2014, through its "free" Gmail service, Google scanned, read, processed, extracted, analyzed, acquired, and used the content and meaning of students' email messages for the purpose of displaying targeted advertising within Gmail and across Google's products and services. Through this ad-related scanning/processing or data mining, Google accessed, obtained, and understood the actual meaning and context of keywords and phrases within email messages. Within G SUITE, however, the contractual default setting between the customer school and Google is one that prohibits Google from serving advertisements or using Customer Data, "including email," for purposes beyond those set out in the Agreements— including Google's own commercial or advertising purposes. Google nevertheless data mined(es) Mississippi students' email content without regard to this contractual prohibition.

24

76.    As noted above, all versions of the G SUITE Agreement and initial version of the DPA define students' "Customer Data" as data, "*including email,* provided, generated transmitted or displayed" via G SUITE Core Services. Likewise, subsequent DPA versions defined student "Customer Data" as "data (which may include personal data and the categories of data referred to in Appendix 1) submitted, stored, sent, or received" via the G SUITE Core Services. Appendix 1 specifically includes email.

77.    Thus, all contractual promises, policy statements, and other commitments discussed above are fully applicable to the content of emails student G SUITE users send or receive via Gmail.

78.    In relevant versions of the G SUITE Agreement, Google also:

- promises to "protect against *unauthorized access to or use of Customer Data*";

- disclaims any rights, implied or otherwise, in "Customer Data" as defined above; and

- agrees that it does not obtain any rights, implied or otherwise, to the content or intellectual property in email messages.

Despite these contractual prohibitions, Google both (1) exercises control over and uses Mississippi students' user data as if it was its own; and (2) creates derivative data or information from the students' private email content for its own benefit and commercial use.

79.    Further during this period, the Gmail Legal Notice expressly limited Google from using end user email content and data for any purposes *except to provide the service.* Because advertising and use of student data for commercial or advertising purposes is prohibited in G SUITE, Google's ad-related scanning, processing, or data mining is not the provision of Gmail and violates the G SUITE agreements and Gmail Legal Notice.

80.    Reinforcing its contractual obligations, Google falsely marketed G SUITE through documents and information such as the 2010 Google Apps for Education White Paper

titled "Moving your university to the cloud – and bringing faculty with you." Therein, Google guarantees that,

> [s]ince Google Apps for Education is completely ad-free, *your school's content isn't processed by Google's advertising systems*. Automated content scanning (with no human involvement) makes Apps work better for users by providing spam-filtering, anti-virus protection and malware protection; and also enables unique functionality like powerful search in Gmail and Google Docs.

(emphasis added). Google also proclaims that "the Privacy Policy explicitly guarantees that we will not inappropriately share *or use* personal information within Google Apps." (emphasis added). "*Your content belongs to your school, or the individual users* at your school and the Google Apps Terms of Service contractually ensures that your institution (or students, faculty, and staff) is the sole owner of this data." (emphasis added). Contrary to its marketing and in furtherance of its unfair and deceptive scheme, Google: (1) processes end user email content through its advertising systems; (2) exceeds the scope of automated content scanning; (3) manifests control and ownership over user data; (4) creates derivative data for its own use; and (5) violates its privacy policies and terms of service.

81. Google's unfair and deceptive scheme also contradicts its G SUITE help and support web page, titled "What kind of scanning/indexing of user data is done?" There, Google explains:

> Email is scanned so we can display contextually relevant advertising in some circumstances. (*Note that there is no ad-related scanning or processing in [G SUITE] or Business with ads disabled*).
>
> In other words, *we only scan or index user content in [G SUITE] in order to provide features that will directly benefit users, or to help us maintain the safety and security of our systems.*

(emphasis added).

82. The G SUITE help and support page titled "Security & Privacy" declares:

> No advertising to students, faculty, or staff

We offer Google Apps for Education to schools for free. It's also completely ad-free—*which means your school's content is not processed by Google advertising systems*.

(emphasis added). On the same page, Google also declares, "*We don't look at your content*."

(emphasis added).

83.    Another G SUITE help and support page titled "Security & Privacy" reiterates

Google's agreement to limit its data processing in G SUITE:

Email is scanned so we can display contextually relevant advertising in some circumstances. (*Note that there is no ad-related scanning or processing in Google Apps for Education or Business with ads disabled*).

In other words, *we only scan or index user content in Google Apps in order to provide features that will directly benefit users, or to help us maintain the safety and security of our systems*.

(emphasis added).

84.    By October of 2013 and as a result of litigation involving Google's scheme,

Google removed from its web pages the statement, "Note that there is no ad-related scanning or

processing in Google Apps for Education or Business with ads disabled."

85.    As previously alleged, on March 13, 2014, Google publicly confirmed that the

emails of all G SUITE end users were in fact scanned, processed, and data-mined for potential

advertising via Google's automated processes that could not be turned off—even for G SUITE

customers who elected not to receive ads. On April 30, 2014, Google announced that it would

permanently remove all ad scanning in Gmail for G SUITE. Google further explained that it

would no longer collect or use student data in G SUITE services for advertising purposes. But on

information and belief, Google continues to data-mine the email content of Mississippi's

students and uses the collected data beyond solely for the provision of the Gmail service.

86.    Throughout all times during the pendency of Google's unfair and deceptive

scheme, and on information and belief, Google to this day: (a) performs ad-related scanning,

processing, or data mining of end user email messages; and (b) collects and uses end user email content and data for purposes other than to provide the enumerated services that directly benefit end users, including its own commercial and advertising purposes.

**C.    Google deceptively markets G SUITE, Chromebooks, and other Google Products as COPPA compliant.**

87.    As part of its overarching scheme to portray itself as protecting privacy—but at the same time unlawfully collect, maintain, and use Mississippi student data—Google deceptively asserts that it complies with the Children's Online Privacy Protection Act of 1998 ("COPPA"). Google, without limitation, guarantees:

- "G Suite for Education and Chromebooks support compliance with rigorous standards[,]" including "COPPA (Children's Online Privacy Protection Act of 1998)";[10]

- "Schools can use G Suite core services in compliance with COPPA and FERPA" (Family Educational Rights and Privacy Act);[11]

- "Chromebooks adhere to the Student Privacy Pledge so that schools can use these in compliance with COPPA and FERPA";[12] and

- "Best-in-class security and data protection. . . . Chromebooks are designed with multiple layers of security to keep them safe from viruses and malware. We ensure they comply with the Student Privacy Pledge so that schools can use them in compliance with COPPA and FERPA."[13]

88.    Google consistently identifies "G Suite for Education users" in association with "access to other Google services;" "[G SUITE users] in Additional services;" "[K-12 G SUITE

---

[10] *Privacy & Security Center*, Google for Education, *available at* https://edu.google.com/why-google/privacy-security/?modal_active=none (last visited Oct. 22, 2019).
[11] Id.
[12] *Chromebooks Privacy and Security,* Google, *available at* http://services.google.com/fh/files/misc/chromebooks_privacy_security.pdf (last visited Oct. 22, 2019).
[13] *Make learning more effective and engaging with Chromebooks,* Google for Education, *available at* https://edu.google.com/products/chromebooks/?modal_active=none (last visited Oct. 22, 2019).

users in primary and secondary schools" as being in "Core Services or other Google services accessed while using G Suite for Education account."[14]

89.      Because of the personal information Google collects from Mississippi K-12 students on G SUITE account creation, Google has actual knowledge of the students' age. Thus, for all 13 and under students who have G SUITE accounts and use *any* Google service, COPPA applies to all of Google's data collection, retention, storage, and use activities. It also applies to Google's disclosure of Mississippi student data to third parties, including YouTube.

90.      Google's *affirmative statements* regarding its compliance with COPPA are false and constitute deceptive conduct.

### 1.    Google made and maintains deceptive statements regarding COPPA compliance and parental consent.

91.      Google's affirmative statements that its conduct complies with COPPA are false because it never obtains parental consent for activities unrelated to educational and/or school purposes.

92.      Google undertakes no effort to obtain parental consent for any of its activities, and Google has never attempted to verify that parental consent has been obtained for any of its activities.

93.      Mississippi schools and school districts have authority to (1) offer and use Google's services for educational/school purposes or in an educational context; and (2) access, monitor, use, or disclose end user data for educational/school purposes or in an educational context. Likewise, when offering online programs for the benefit of their students, the school system, and/or educational purposes, schools may consent on behalf of parents for third-party

---

[14] *G Suite for Education Privacy Notice,* supra note 8.

website operators to collect and use information. Critically, this consent only applies to information collection and use *in the educational context*.

94.    Before Google can rely on schools' authority to consent for educational purposes, Google must:

(1)    provide the school with *all the notices required under COPPA*;

(2)    upon request from the school, provide the school a description of the types of personal information collected;

(3)    provide the school an opportunity to review the child's personal information and/or have the information deleted; and

(4)    provide the school the opportunity to *prevent further use or online collection of child's personal information*.

95.    Google neither provides required COPPA notices nor allows Mississippi schools to prevent further use or online collection of Mississippi children's data.

96.    Likewise, Google has never attempted to verify parental consent from any Mississippi parent and has no policy in place to do so.

97.    Instead of discharging its prerequisites to rely on schools' consent, Google engages in further deceptive conduct by misrepresenting—as a matter of law and fact—that Mississippi schools are somehow solely responsible for Google's COPPA compliance. In the G SUITE Agreements effective from 2007 to 2016, Google stated:

Customer acknowledges and agrees that it is solely responsible for compliance with [COPPA], including, but not limited to, obtaining parental consent concerning collection of students' personal information used in connection with the provisioning and use of the [G SUITE] Services by the Customer and End Users.

98.    Google then deceptively represents to the public that Google and G SUITE are compliant with COPPA because Google contractually compels *schools* to comply, as if that obtains consent *on behalf of Google*:

30

- "Can G Suite for Education be used in compliance with the Children's Online Privacy Protection Act (COPPA)? Yes. *We contractually require that schools using G Suite for Education get the parental consent required by COPPA. Our services can be sued in compliance with COPPA as long as a school has parental consent*."[15]

- "U.S. regulation applicable to the collection of personal information from children under the age of 13. COPPA imposes certain requirements on operators of websites or online services directed to children under 13 years of age, and on operators of other websites or online services that have actual knowledge that they are collecting personal information online from a child under 13 years of age.

  G Suite for Education: *G Suite for Education contractually requires that schools using G Suite meet the parental consent requirements under COPPA*."[16]

(emphasis added).

99.    Google's statements are first false as a matter of fact. The agreements between Google and Mississippi schools—for purposes of COPPA—require Schools to obtain their *own consent* for their access of student personal information through G SUITE account administration. Nowhere does Google even attempt to comply with COPPA, and nowhere does it require any Mississippi school to obtain COPPA parental consent *on behalf of Google*.

100.    Google's statements are also false as a matter of law. The FTC explicitly mandates that, if a third-party operator like Google collects and uses student data for commercial purposes (or purposes other than educational), then that third-party operator must obtain *verifiable* parental consent. In other words, unlike when Google uses student data for educational purposes, Google cannot *rely on schools* to obtain parental consent when Google uses such data for commercial purposes. Instead, until it obtains verified parental consent, Google cannot use any student's personal information for any non-educational purposes.

---

[15] *Privacy and Security Information,* G Suite for Education (emphasis added), *available at* https://services.google.com/fh/files/misc/gsuite_for_education_privacy_security.pdf (last visited Oct. 22, 2019).
[16] *Standards, regulations & certifications,* Google Cloud (emphasis added), *available at* https://cloud.google.com/security/compliance/coppa/ (last visited Oct. 22, 2019).

## 2.    Google deceptively retains student data in violation of COPPA.

101.    Google's guarantees of COPPA compliance are also deceptive because Google

collects and retains student data in violation of COPPA. Titled "Data retention and deletion

requirements," 16 C.F.R. § 312.10 states:

> An operator of a Web site or online service shall retain personal information
> collected online from a child for *only as long as is reasonably necessary to fulfill
> the purpose for which the information was collected*. The operator must delete such
> information using reasonable measures to protect against unauthorized access to,
> or use of, the information in connection with its deletion.

(emphasis added). This two-fold restriction on use and retention has no consent defense or

exception. As such, even if a school or parent properly consents to the initial collection and use,

Google cannot use or retain the data beyond what is reasonably necessary to the purpose for

which it collected the information.

## 3.    Google conditions students' use of its Core and Additional Services on their disclosure of more personal information than is reasonably necessary to do so.

102.    Google's guarantees of COPPA compliance are also deceptive because Google

conditions students' use of Additional Services on their disclosure of more personal information

than is reasonably necessary to do so. Titled "Prohibition against conditioning a child's

participation on collection of personal information," 16 C.F.R. § 312.7 states:

> An operator is prohibited from conditioning a child's participation in a game, the
> offering of a prize, or another activity on the child's disclosing more personal
> information than is reasonably necessary to participate in such activity.

103.    Google falsely claims it is COPPA compliant while it uses and/or combines all

data of Mississippi students under 13, from one internet service to another, or when they access

an Additional Service while using their G SUITE accounts. But Google cannot "condition" any

child's use of G SUITE on their disclosure of personal information that Google uses far beyond

necessary for the child to participate in G SUITE or Additional Services. Nonetheless, Google

repeatedly claims not only that it can perform such activities, but it deceptively assures schools and parents that it obtains consent to do so.

104.    Google's guarantees of COPPA compliance are false, deceptive, and intentional, and Google uses them to further its overall scheme to deceive Mississippi's schools, parents, and students about its services.

## VI. VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT (MCPA), Miss. Code Ann. §§ 75-24-1, *et seq.*

105.    The State re-alleges and incorporates all prior paragraphs of this Complaint as if stated fully herein.

106.    Google is a "person" within the meaning of, and subject to, the MCPA, Miss. Code Ann. § 75-24-3(a).

107.    Google's marketing, implementing, and administering G SUITE accounts; its contractual agreements with G SUITE customers, including prior versions; and its statements, terms, and policies expressed to G SUITE users, including prior versions, amount to conduct of "any trade or commerce," as defined by Mississippi law.

108.    As described herein, through Google's false marketing, implementing, and provision of the G SUITE accounts, to include Google's statements made in relation to its G SUITE Services, Google has in the past and continues to affect commerce through unfair methods of competition and unfair or deceptive trade practices, as prohibited by the MCPA, Miss. Code Ann. § 75-24-5.

109.    At all times material to its actions, Google knowingly and willfully violated the MCPA, Miss. Code Ann. § 75-24-5.

### *Google's Unfair Methods of Competition and Deceptive Trade Practices*

110.   Through Google's unfair and deceptive scheme, as described fully in the preceding paragraphs and incorporated herein, Google unfairly and deceptively markets, implements, and provides G SUITE to Mississippi's K-12 schools and their students. In doing so, Google committed and commits acts of unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce in violation of the MPCA, MISS. CODE ANN. § 75-24-5.

111.   As a result of its unfair methods of competition and unfair or deceptive acts, Google obtained, maintained, and maintains agreements with Mississippi's K-12 schools, which then allowed Google to garner an unfair introduction of its products to Mississippi consumers through individual G SUITE user accounts. Upon the opening and using of each G SUITE account, Google's unfair and deceptive acts have allowed it to amass G SUITE user accounts and gain unauthorized access to K-12 student data.

112.   Unbeknownst to Mississippi's G SUITE customer schools and their G SUITE users, Google secretly accesses, reads, takes, acquires, copies, and uses the G SUITE users' personal information, content, and data for its own benefit and financial gain, in contradiction and violation of Google's multiple expressed commitments to schools and G SUITE users.

113.   Unbeknownst to Mississippi's G SUITE users, Google requires schools, students, or those acting on their behalf to agree to (a) terms which do not accurately reflect the rights of the parties, (b) terms which Google has no right to obtain, and (c) terms which Google is expressly prohibited from obtaining.

114.   Through its scheme, Google affected commerce by engaging in unfair methods of competition and deceptive acts and trade practices in violation of the MCPA, MISS. CODE ANN. § 75-24-5(1).

115. In addition, MISS. CODE ANN. § 75-24-5(2)'s definition of "deceptive trade practice[s]" includes:

> Representing that goods or services have sponsorship, approval, *characteristics*, ingredients, *uses, benefits*, or quantities *that they do not have* or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;
>
> [r]epresenting that goods or services are of a *particular standard, quality, or grade*, or that goods are of a particular style or model, *if they are of another*; and
>
> [a]dvertising goods or services with intent not to sell them as advertised.

MISS. CODE ANN. § 75-24-5(2)(e), (g), & (i) (emphasis added).

116. Through its scheme, Google violated § 75-24-5(1), (2)(e), 2(g), & 2(i).

117. With the opening of each Mississippi G SUITE user account and/or by requiring G SUITE users to agree to deceptive agreements and other terms, Google committed and continues to commit a separate violation of MISS. CODE ANN. § 75-24-5 with each G SUITE user account.

118. Google's conduct described herein constitutes multiple, separate, distinct, knowing and willful violations of the MCPA for each G SUITE user account created.

119. Because Google is exploiting some of Mississippi's most vulnerable citizens through its false, misleading, unfair and deceptive statements, omissions, and practices, the Attorney General has determined that Google has used and continues to use methods, acts, and/or practices prohibited by the MCPA, that these proceedings are in the public's interest, and that the imposition of an injunction against Google prohibiting the unfair and deceptive conduct is in the public interest. Pursuant to MISS. CODE ANN. § 75-24-9, the State is seeking the entry of a permanent injunction against Google that includes without limitation:

   a. Ordering Google to cease its unfair and deceptive conduct;

b.      Ordering Google to fully disclose (without limitation or conditional language) the extent of Google's collection, processing, and use of data; and

c.      Ordering Google to clearly state and abide by the limitations established by Google's statements, commitments, guarantees, and agreements with the Mississippi G SUITE customers and G SUITE users.

120.    In addition, Google's violations justify civil penalties of up to $10,000 for each violation of the MCPA from 2007 to the present, *see* MISS. CODE ANN. § 75-24-19(1)(b)), and injunctive relief, *see* MISS. CODE ANN.§ 75-24-9. The opening of each and every G SUITE user and customer account created by Google violates the MCPA and is considered a separate violation pursuant to MISS. CODE ANN. § 75-24-19(1)(b).

## VII.  <u>AD DAMNUM</u>

The State of Mississippi, by and through its Attorney General Jim Hood, respectfully requests the entry of judgment against Google, for all the relief requested herein and to which the State may otherwise be entitled, including without limitation:

1.    Entering Judgment in favor of the State against Google in a final order;

2.    Enjoining Google and its employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with it, from affecting commerce within the State of Mississippi by engaging in unfair methods of competition and unfair or deceptive trade practices in violation of Mississippi law and ordering temporary, preliminary, or permanent injunction;

3.    Declaring that each act by Google as described in this Complaint constitutes multiple, separate violations of Mississippi law;

4.    Imposing civil penalties in the amount of $10,000 for each G SUITE account

opened in the State of Mississippi, from 2007 to the present, in violation of MISS. CODE ANN. §§

75-24-1, *et seq*.; and,

5.    Granting the State:

a.    The cost of investigative and reasonable attorneys' fees, as authorized by MISS. CODE ANN. §§ 75-24-1, *et seq*. and, specifically, § 75-24-19(1)(b);

b.    Pre-judgment and post-judgment interest; and,

c.    All other general relief as provided by law and/or as the Court deems appropriate and just.

The State asserts claims herein in excess of the minimum jurisdictional requirements of

this Court.

**THE STATE OF MISSISSIPPI, ex rel.,**
**JIM HOOD, Attorney General for the State of**
**Mississippi, PLAINTIFF**

BY:    _____*/s/ John W. Kitchens*_____
        John W. Kitchens

**Of Counsel:**
Don Kilgore, MSB #3758                F. Jerome Tapley, PHV
Jacqueline H. Ray, MSB #100169        Hirlye R. "Ryan" Lutz III, PHV
Mary Jo Woods, MSB #10468             Brett C. Thompson, PHV
Office of the Attorney General        Cory Watson, P.C.
Post Office Box 220                   2131 Magnolia Avenue South
Jackson, MS 39205                     Birmingham, AL 35205
Telephone: (601) 968-3680            Telephone: (205) 328-2200
Facsimile: (601) 359-2003            jtapley@corywatson.com
dkilg@ago.state.ms.us                rlutz@corywatson.com
jacra@ago.state.ms.us                bthompson@corywatson.com
mwood@ago.state.ms.us

                                      Sean Rommel, PHV
John W. Kitchens, MSB #101137         Wyly-Rommel, PLLC
Kitchens Law Firm, P.A.               4004 Texas Boulevard
Post Office Box 799                   Texarkana, Texas 75503
Crystal Springs, MS 39059            Telephone: (903) 334-8646
Telephone: (601) 892-3067            Facsimile: (903) 334-8645
Facsimile: (601) 892-3057            srommel@wylyrommel.com
jkitchens@kitchenslaw.net

                                      *Attorneys for Plaintiff*

37

## CERTIFICATE OF SERVICE

I, John W. Kitchens, one of the attorneys for the plaintiff, do hereby certify that I have electronically filed the foregoing with the Clerk of the Chancery Court of Lowndes County, State of Mississippi, by using the Court's MEC/ECF system on December 3, 2019.  I further certify that all parties are represented by attorneys who are registered MEC/ECF users and that service will be accomplished by the MEC/ECF system.

This the 3rd day of December, 2019.

_/s/ John W. Kitchens_

John W. Kitchens